J-S30032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 820 EDA 2023 |

Appeal from the Order Entered March 13, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000055-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 821 EDA 2023 |

Appeal from the Decree Entered March 13, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000455-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 822 EDA 2023 |

Appeal from the Order Entered March 13, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000326-2021

J-S30032-23

| | | |
|---|---|---|
| IN THE INTEREST OF: S.T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 823 EDA 2023 |

Appeal from the Decree Entered March 13, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000454-2022

BEFORE: BENDER, P.J.E., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED NOVEMBER 28, 2023**

T.C. ("Father") appeals from the March 13, 2023 decrees granting the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his sons, T.C. a/k/a T.K.C. ("T.K.C.") (born September 2019), and S.C. a/k/a S.T.C. ("S.C.") (born December 2020) (collectively, "the Children").[1] Father further appeals from the March 13, 2023 orders changing the Children's permanency goals to adoption. We affirm the decrees and dismiss the appeal of the orders as moot.

_____

[1] By separate decrees of the same date, the Orphans' court terminated the parental rights of the Children's mother, S.C. ("Mother"). Mother did not file appeals and submitted a letter indicating no position as to Father's appeals. We refer to Mother and Father collectively herein as "Parents."

By order dated and entered March 14, 2013, the court additionally terminated the parental rights of any unknown father as to T.K.C., as there is no named father on his birth certificate. No unknown father filed separate appeals or was a participating party to the instant appeals.

- 2 -

The family became known to DHS as a result of a child protective services ("CPS") report that four-week-old S.C. was brought, unresponsive, to St. Christopher's Hospital for Children ("St. Christopher's") the previous day with evidence of shaken baby syndrome, including bleeding on the brain and a skull fracture. *See* N.T., 3/13/23, at 11-13, 27-28. This report was indicated against Father and Mother, and DHS ultimately determined it was founded. *See* Exhibit DHS-7 (CPS Report); N.T., 3/13/23, at 11-13, 15-16, 28.

Upon examining S.C. at the hospital, the doctors found that he suffered the following injuries:

1. Extensive bilateral mixed density extra-axial (subdural and subarachnoid) and parenchymal hemorrhages, cerebral edema and areas of ischemic injuries to the brain.

2. Linear left parietal skull fracture with associated soft tissue swelling.

3. Cervical ligamentous injury (C2-C5).

4. Epidural hemorrhage to the thoracolumbar spinal canal (T11-L4).

5. Rib fractures - multiple bilateral acute and healing posterior rib fractures.

6. Left paraspinal musculature soft tissue edema/swelling.

7. Possible pulmonary contusion/hemorrhage.

8. Bilateral healing clavicle fractures.

9. Classic metaphyseal lesion (CML) to the right proximal humerus.

10. Classic metaphyseal lesion (CML) to the right and left proximal femurs.

11. Cutaneous injuries to the neck (bilateral).

12. Cutaneous injuries to the chest.

Exhibit DHS-10 (Child Protection Team Consultation Report) at 10-11 (punctuation added and numbering corrected); N.T. 3/13/23, at 11-13, 28-30. DHS investigative social worker Tierra Dunn attempted to speak to Father and Mother but both declined to speak or offer any explanation for S.C.'s injuries. **See** N.T., 3/13/23, at 16, 19-20. Dr. Norrell Atkinson, an expert in child abuse, examined S.C. upon his arrival at St. Christopher's and found he had twenty-four unexplained fractures, some of which had been inflicted ten to fourteen days before, and some of which were new. **See id**. at 34. Dr. Atkinson diagnosed S.C. as the victim of severe physical child abuse. **See id**., at 12, 37-38.

The police arrested Parents on charges of attempted murder, conspiracy, endangering the welfare of children, recklessly endangering another person, aggravated assault, and simple assault relating to S.C.'s injuries. DHS obtained an order of protective custody ("OPC") of T.K.C. in January 2021, and of S.C. in March 2021, upon his discharge from the hospital. **See** N.T. 3/13/23, at 17. T.K.C. was placed with his maternal great-grandmother, and S.C. was placed in a medical group home; both remained in those placements at the time of the termination proceeding two years later. **See** N.T., 3/13/23, at 17, 22-23, 48-49, 65. In January 2021, the court

entered a one-year no-contact/stay-away order as to Parents. **See** Dependency Protective Order, 1/20/21; N.T., 3/13/23, at 24. Parents were permitted one joint 30-minute virtual visit per week during that year. **See** Shelter Care Order, 1/20/21. Father did not participate in the virtual visits. **See** N.T., 3/13/23, at 63.

The court adjudicated the Children dependent in June 2021, and established permanency goals of reunification. **See** Orders of Adjudication and Disposition, 6/8/21. In the related criminal cases, stay-away orders against Father were entered. **See id**.; N.T., 3/13/23, at 63. Those orders remained in place at the time of the hearing on all of DHS's petitions. **See** Exhibits DHS-3 and DHS-4 (Dependency Dockets).

In furtherance of the Children's reunification with Parents, DHS established a single case plan with objectives for Father focused on parenting, anger management, and mental health. **See** N.T., 3/13/23, at 61. Father completed both parenting and anger management courses in 2022 after the filing of the termination petitions and engaged in medical management and therapy. **See id**. at 61-63.

In July 2022, DHS filed petitions for the involuntary termination of parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), as well as petitions to change the Children's permanency goals from reunification to adoption. The court established concurrent goals of adoption in January 2023. **See** Permanency Review Orders, 1/10/23.

In March 2023, the court held a hearing on DHS's petitions to terminate Father's and Mother's parental rights and change the Children's goal to adoption. The Children, who were three and two years old at the time, were represented by a guardian *ad litem* ("GAL"), Maria D'Adamo, Esquire, whom the court appointed in January 2020.[2]  Parents remained incarcerated at the time of the hearing.  Father was present and represented by counsel but presented no evidence.  Mother appeared by telephone and testified on her own behalf.  **See** Exhibit DHS-5 (Certified Criminal Record); Exhibit DHS-6 (Criminal Docket); N.T., 3/13/23, at 11-13, 28, 49.[3]

---

[2] Because the Children's preferences were incapable of ascertainment due to their young age, we conclude that Attorney D'Adamo's representation satisfied the requirements of 23 Pa.C.S.A. § 2313(a) to protect the Children's legal interests and best interests.  **See In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings").

Attorney D'Adamo died during the pendency of these appeals.  This Court therefore vacated her appearance and directed the Orphans' court to appoint a new GAL within 30 days.  This Court further ordered that the briefing schedule be vacated and re-established upon the appointment of a new GAL. The Orphans' court appointed Robin Bannister, Esquire, and this Court re-established a briefing schedule with a GAL brief due October 24, 2023. Attorney Bannister has indicated she does not intend to file a brief.  No party has asserted that Attorney D'Adamo failed to represent Children's interests at the hearing effectively, and we discern no deficiency in that representation.

[3] Mother had been sentenced to a period of three-and-one-half to seven years of incarceration, plus a period of three years of probation, following her guilty

*(Footnote Continued Next Page)*

Dr. Atkinson testified at the hearing about a conversation she had with Mother in person and Father via speakerphone. She testified S.C's injuries were inconsistent with Mother's suggestion that her sixteen-month-old, T.K.C., caused them, and Father offered no explanation for S.C.'s injuries during the thirty-to-sixty-minute conversation. *See id*. at 30-31, 38, 40-41. Dr. Atkinson also testified Mother said S.C. was fine when she put him down, Mother asked Father to check on S.C. when he started crying, and when Father retrieved S.C., he was unresponsive. *See id*. at 42-43. The evidence established Parents were S.C.'s caregivers during the relevant time period, and he was not in daycare. *See id*. at 45-46.

Natasha Triplett ("Triplett"), a case manager for the Community Umbrella Agency ("CUA"), testified at the hearing that S.C., who was then two years old, was receiving speech services and being taught to swallow. *See* N.T., 3/13/23, at 65. Triplett testified S.C. receives twenty-four-hour care including early intervention services for occupational therapy, physical therapy, and speech, and treatment from numerous specialists for neurological, endocrinological, and visual issues. *See id*. Triplett testified Mother asks about the Children, but Father failed to ask about them during

---

plea to aggravated assault and conspiracy to commit aggravated assault, as well as endangering the welfare of children. *See* Exhibit DHS-5 (Certified Criminal Record); N.T. 3/13/23, at 49-50; *see also* Exhibit DHS-8 (CPS Investigation Report/CY-48). Father had not yet had his criminal trial. *See* N.T., 3/13/23, at 49-51.

his meetings with CUA. *See id*. at 53, 63. Triplett also testified that maternal great-grandmother with whom T.K.C.'s is bonded meets all of his needs, S.C. does not have a bond with Father, and it would be in the children's best interests to have Father's parental rights terminated. *See id*. at 64-65.

By decrees dated and entered March 13, 2023, the Orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In addition, by separate orders dated and entered March 13, 2023, the court changed the Children's permanency goals from reunification to adoption.

Father filed timely notices of appeal and complied with Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' court filed a responsive opinion.[4]

On appeal, Father raises the following issues for our review:

1. Whether the [Orphans'] court committed reversible error when it involuntarily terminated Father's parental rights where such determination was not supported by clear and convincing evidence under . . . 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

2. Whether the [Orphans'] court committed reversible error when it involuntarily terminated Father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by . . . 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 8 (some capitalization added and punctuation corrected).[5]

_____

[4] Father's appeals were consolidated by this Court *sua sponte* in April 2023.

[5] Although Father filed notices of appeal regarding the goal change orders, he did not raise them is his statement of questions involved. We could find that
*(Footnote Continued Next Page)*

Father's issues implicate the involuntary termination of parental rights. Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See In re L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). In applying this standard, an appellate court must accept the trial court's findings of fact and credibility determinations if supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021); *see also In re C.M.*, 255 A.3d 343, 358 (Pa. 2021). This standard "reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings." *In re S.P.*, 47 A.3d 817, 830 (Pa. 2012).

In considering a petition to terminate parental rights, a court must balance the parent's fundamental right "to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *See C.M.*, 255 A.3d at 358.

---

Father has waived such challenges for failing to raise them in his statement of questions involved portion of his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (holding that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived). However, given our decision to affirm the court's termination decree disposition, Father's challenges are moot. *See In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.").

Termination of parental rights can have "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. Pennsylvania law requires the moving party in a parental rights termination case to establish the statutory grounds by clear and convincing evidence, evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022). We remain mindful that "a parent's basic constitutional right to the custody and rearing of [his] child is converted, upon the failure to fulfill [his] parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Here, the Orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). To affirm the decree, we need only agree with the court's decision as to any one section of 2511(a), along with section (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we analyze the court's termination decree pursuant to section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the application of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong

continuous parental ties. . .. ***This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it***." ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. ***See In re S.C.***, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by* ***In re K.T.***, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***See In re M.A.B***., 166 A.3d 434, 443 (Pa. Super. 2017).

Our Supreme Court has, in its words, "definitively h[e]ld" that although incarceration is not a "litmus test for termination,"

> [it] can be determinative of the question of whether a parent is capable of providing "essential parental care, control, or subsistence," and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to [section 2511(a)(2)].

***S.P.***, 47 A.3d at 830 (citation omitted). Further, with respect to no-contact orders, in ***In re A.D.***, 93 A.3d 888, 896-97 (Pa. Super. 2014), this Court concluded that a no-contact order is relevant to parental "incapacity."

On appeal, Father asserts that the Orphans' court improperly relied on his incarceration alone in terminating his parental rights. ***See*** Father's Brief

at 16-17. Specifically, Father asserts that he "has continually professed his innocence since the incident occurred and at all times thereafter has conducted himself with the intent of regaining custody of his children." *Id*. at 17.

The Orphans' court found that criminal stay-away orders rendered Father incapable of parenting the Children. In addition, the court found that Father's continued refusal and neglect caused the Children to be without essential parental care and control. The Orphans' court explained as follows:

> The evidence established that "incapacity" and "refusal" under 2511(a)(2) existed given that Father failed to demonstrate a concrete desire or ability to care for the Children. Mother and Father lived together when S.C. was severely physically abused and deemed a near fatality at only four weeks old. Father listened on the phone while Mother spoke with Dr. Atkinson about S.C.'s injuries, but he failed to provide an explanation as to how S.C. received 24 fractures and was in life-threatening conditions. Father was criminal[ly] charged with [] attempted murder, criminal conspiracy, aggravated assault, endangering the welfare of children wherein the parent/guardian/other commits the offense, simple assault, and recklessly endangering another person. As a result of Father's charges, a criminal stay away order was issued on behalf of the Children due to Father's actions or inactions.
>
> Moreover, the evidence established that "neglect" existed given that Father has failed to concern himself with [the] Children's medical, educational, and therapeutic needs. Father is unable to visit the Children or speak to [the] Children due to the stay away order and no-contact order issued on their behalf. Father has shown that he is unable to keep the Children safe and cannot explain how S.C. was injured. Throughout the life of this case, Father has not parented the Children . . .. Based on the foregoing, this [c]ourt found that competent evidence existed to justify the termination of Father's parental rights pursuant to section 2511(a)(2).

- 13 -

Orphans' Court Opinion, 5/25/23, at 18-19 (internal and record citations omitted).

A review of the record supports the Orphans' court's findings, and refutes the assertion that the court relied solely on Father's incarceration as the basis for termination. S.C. suffered serious, extensive, and repeated injuries, determined to be severe child physical abuse, inflicted while in Father's and Mother's primary care. **See** N.T., 3/13/23, at 37-38, 45; Exhibit DHS-7 (CPS Report).[6] Further, Father failed to offer an explanation for S.C.'s injuries, or how S.C. went from crying to unresponsive when he looked in on the child immediately prior to S.C.'s hospitalization. **See** Exhibit DHS-8; N.T., 3/13/23, at 19-20, 30-31, 37, 42-43. The Orphans' court's conclusion is also supported by the fact that according to the expert medical evidence, S.C. suffered not only recent traumatic injury but repeated traumatic injury with old and new injuries. It is reasonable to conclude Father would have been aware of those old injuries, and his failure to act on them speaks to his inability or unwillingness to protect S.C. Further, although Father completed his objectives aimed at reunification, **see** N.T., 3/13/23, at 61-63, 70, there was evidence at the hearing to support the Orphans' court's conclusion Father made no effort to find out about the children or overcome the limits on his

---

[6] Father had been subject to stay-away orders for nearly two years at the time of the hearing. **See** Orders of Adjudication and Disposition, 6/8/21; N.T., 3/13/23, at 63; **see also** Exhibits DHS-3 and DHS-4.

contact with them by, for instance, participating in the court-authorized weekly virtual calls with them. **See id**. at 63 (testimony that Father he had no contact with the Children and failed to inquire about them during meetings with CUA).[7]  Based on the foregoing, we find evidence to support the Orphans' court's termination of Father's parental rights pursuant to section 2511(a)(2) because his abuse, neglect and refusal caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being.  Further, the conditions and causes of his incapacity, abuse, neglect and refusal cannot or will not be remedied. **See S.C.**, 247 A.3d at 1104; **A.D.**, 93 A.3d at 897.  As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to section 2511(a)(2), we next must determine whether termination was proper under section 2511(b).  Section 2511(b) requires a separate consideration of whether termination will meet the child's needs and welfare. **See Z.P.**, 994 A.2d at 1121.  The Supreme Court has recently re-emphasized that pursuant

---

[7] We are unable to discern from the certified record the nature and frequency of Father's contact with CUA.

- 15 -

to section 2511(b) courts "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . .. This of course requires the court to focus on the child and consider all three categories of need and welfare." *K.T.*, 296 A.3d at 1105 (Pa. 2023). *K.T.* specifically directs courts to "consider the matter *from the child's perspective*, placing [his] developmental, physical, and emotional needs and welfare *above concerns for the parent*." *Id*. (citation omitted; emphasis added). The child's emotional needs and welfare include intangibles, such as love, comfort, security, and stability. *See T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).[8]

When it considers the parental bond, the court must examine whether termination of parental rights "will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences". *K.T.*, 296 A.3d at 1110 (quotation marks and original case citation omitted). That focus enables a court to properly prioritize the child's needs:

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts

_____

[8] Courts considering an involuntary termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development *quickly*." *K.T.*, 296 A.3d at 1108 (citation omitted; emphasis in original) (also noting that *T.S.M.* advised courts to move toward an alternative permanent home when it is clear the parent will be unable to provide for the child's basic needs in the near future, so as not to impair the bond with pre-adoptive parents).

correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*Id*. The subsection (b) inquiry must consider not only the parental bond, if any, but also the child's need for permanency, the length of time in foster care, whether the child is in a foster home and bonded with foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible ones. *See K.T.*, 296 A.3d at 1106.

Father argues that a bond does exist with the Children and cites the fact that T.K.C. still asked about Father as late as 2023. *See* Father's Brief at 18-19.

In concluding that termination of Father's parental rights best serves the Children's developmental, physical, and emotional needs and welfare pursuant to section 2511(b), the Orphans' court emphasized its contact with the case since its inception and its sense of the progress of the case. *See* N.T., 3/13/23, at 88. The court stated:

> In the instant matter, this court determined the Children would not suffer irreparable emotional harm if Father's parental rights were terminated. There was compelling testimony that the Children would not suffer harm if Father's parental rights were terminated and that T.K.C. was significantly bonded with his great-grandmother. Father has been in contact with CUA for the purposes of completing his single case plan objectives but has failed to contact CUA for updates on the Children. The testimony demonstrated that T.K.C.'s primary bond is with his maternal great-grandmother. S.C. is still recovering from his life-threatening injuries, but he receives consistent visits from his paternal grandmother. Additionally, the testimony demonstrated that T.K.C.'s foster mother meets all of his educational, medical

and emotional needs and S.C.'s needs are being met by the medical group home. In determining that termination would best serve the needs and welfare of the Children, this court considered that Father has not been able to meet the Children's emotional, physical, and developmental needs for over one year prior to the termination hearing. For the foregoing reasons, this court properly granted DHS's petition to involuntarily terminate Father's parental rights pursuant to section 2511(b).

Orphans' Court Opinion, 5/25/23, at 22-23 (some capitalization changed and record citations omitted).

We perceive no error in the Orphans' court's determination. Triplett opined that the Children would not suffer irreparable harm from Father's rights being terminated and changing permanency goals to adoption would be in their best interests. *See* N.T., 3/23/23, at 64-65. Although T.K.C. knows who Mother and Father are and has their photos in his bedroom, Triplett testified that Father does not have a parent-child relationship with either child.[9] *Id.* at 63-64, 71. Triplett explained, "There has been a lack of meaningful contact over the life of the case." *Id*. at 64. She further stated T.K.C.'s maternal great-grandmother was a pre-adoptive resource, and "[T.K.C.] depends on his current caregiver for all of his needs to be met. He is bonded to his maternal great[-]grandmother." *Id*. at 59, 64. Triplett further testified that S.C., then two years old, remained in the same medical group home where he receives twenty-four-hour care. *Id.* at 65.

---

[9] Triplett was unable to estimate the date that T.K.C. last asked about Father but stated that it was possibly in 2023. N.T., 3/13/23, at 71. She was not asked and did not testify as to the frequency of T.K.C.'s inquiries.

- 18 -

Significantly, the Children were sixteen months old and three months old, respectively, at the time of placement. **See** N.T., 3/13/23, at 48. They had been in care for twenty-six months and twenty-four months, respectively, at the time of the hearing without contact with, or inquiry by, Father. **See id**. at 63.

Accordingly, we discern no abuse of discretion in the Orphans' court's best interests determination. Considered from the appropriate perspective, the Children's, termination of Father's parental rights best served the Children. **See K.T.**, 296 A.3d at 1105. Even if there had been evidence that the Children were bonded to Father – and there was not – termination would still be the proper result. As this Court has recognized, "concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound." **In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008) (also stating that "it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent"). The record supports the finding that the Children's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to section 2511(b). **See T.S.M.**, 71 A.3d at 267.

Based on the foregoing, we affirm the decrees terminating Father's parental rights and dismiss as moot Father's challenges to the orders changing the Children's permanency goals to adoption.

Decrees affirmed.  Orders dismissed as moot.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/28/2023